**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | CASE NO. 16-80220 |
| FRONTERA RESOURCES HOLDINGS, LLC, | § | |
| | § | Chapter 7 |
| Debtor | § | |
| ———————————————— | § | |
| | § | |
| | § | |
| | § | |
| FRONTERA RESOURCES | § | |
| CORPORATION | § | |
| | § | ADVERSARY NO. |
| Plaintiff | § | |
| | § | |
| VS. | § | |
| | § | |
| JANET S. CASCIATO-NORTHRUP, IN HER | § | |
| CAPACITY AS TRUSTEE FOR THE ESTATE | § | |
| OF FRONTERA RESOURCES HOLDINGS, LLC; | § | |
| OUTRIDER MANAGEMENT, LLC; OUTRIDER | § | |
| MASTER FUND, LP; ELMAR FINANCE, INC.; | § | |
| IONIC CAPITAL PARTNERS, LP,; CSTN, LTD. | § | |
| | § | |
| Defendant(s) | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW, FRONTERA RESOURCES CORPORATION ("Frontera") filing this its

Original Complaint against Defendants Janet S. Casciato-Northrup, solely in her capacity as the

Chapter 7 Trustee of the estate of Frontera Resources Holdings, LLC; Outrider Management,

LLC; Outrider Master Fund, LP (collectively with Outrider Management, LLC, "Outrider");

Elmar Finance, Inc. ("Elmar"); Ionic Capital Partners, LP ("Ionic"); CSTN, Ltd. ("CSTN" or,

collectively with Outrider, Elmar, and Ionic, the "Noteholders").  Frontera respectfully shows the

1

Court as follows:

## I.
## INTRODUCTION

1.      Frontera is the 100% owner of Frontera Resources Holdings, LLC ("Holdings"), the debtor in this proceeding under Chapter 7 of the United States Bankruptcy Code.  As reflected in Holdings' schedules of assets and liabilities, Holdings' sole debt arise out of a series of 10% Convertible Notes (the "Notes") issued by Holdings that are scheduled to mature on August 1, 2016.  Holdings finds that it is unable to pay the Notes when due and, accordingly, has initiated the instant bankruptcy action.  Holdings lists among its potential assets a contingent claim against Frontera for contributions in support of the repayment of the Notes under one or more provisions of the Note Purchase Agreement dated August 1, 2011, which supplied the terms and conditions governing the Notes.  Frontera denies that any such obligation is owed either to Holdings or to any Noteholder.

2.      Frontera further asserts claims against Outrider for tortious interference with contract, misappropriation of trade secrets and fraud, arising out of its inducement of Frontera to supply confidential, proprietary and trade secret information to third party MND, a.s. ("MND"), ostensibly in support of a proposed farm-in agreement with respect to certain oil and gas interests held by Frontera in the Republic of Georgia.  Frontera provided this confidential, proprietary and trade secret information to MND, including much of its most sensitive and protected commercial, technical, seismic and reserve information, subject to the terms of a strict confidentiality agreement that restricted MND's permissible use to evaluating the terms of that proposed farm-in agreement and that prohibited MND from sharing that information with Outrider or other third parties.

3.      Frontera later learned that MND, acting in concert with Outrider, had

misrepresented the purpose of its due diligence, and instead breached the confidentiality agreement and used Frontera's confidential information to evaluate and advance a hostile acquisition of Frontera itself.  Upon information and belief, MND shared Frontera's confidential, proprietary and trade secret information with Outrider in further breach of its confidentiality agreement with Frontera, and Outrider has and is continuing to use that information to Frontera's detriment, including without limitation by attempting to interfere with Frontera's recent efforts to recapitalize itself and Holdings.  Frontera is entitled to actual and punitive damages from Outrider, disgorgement of any and all benefits that Outrider received as a result of its misappropriation of Frontera's confidential information and trade secrets, and injunctive relief barring Outrider from the continued misuse of its trade secrets and confidential information and requiring Outrider to disgorge any and all confidential information that it obtained by virtue of its wrongdoing.  Such damages may serve as an offset to any obligation that the Court may find on the part of Frontera to partially or fully repay the Notes.

## II.
### PARTIES

4.     Plaintiff Frontera Resources Corporation is a corporation organized and existing under the laws of the Cayman Islands, and has its principal place of business in Houston, Harris County, Texas.

5.     Defendant Janet S. Casciato-Northrup is named in solely her capacity as the Chapter 7 Trustee for the bankruptcy estate of Frontera Resources Holdings, LLC, a limited liability company organized and existing under the laws of the state of Delaware, and with its principal place of business in Houston, Texas. Ms. Casciato-Northrup may be served at the offices of Hughes Watters & Askanase , 1201 Louisiana, 28th Floor, Houston, Texas, 77002.

6.     Defendant Outrider Management, LLC, is a limited liability company organized

3

and existing under the laws of the state of California, and has its principal place of business in San Bruno, California.  Outrider Management, LLC, may be served through its registered agent for service of process, Stephen Hope, 1001 Bayhill Dr. Ste 125, San Bruno, CA 94066.

7.     Defendant Outrider Master Fund, LP, is a limited partnership.  Upon information and belief, Outrider Master Fund, LP is organized and existing under the laws of Cayman Islands, and maintains its principal place of business at 1001 Bayhill Drive, Suite 125 San Bruno, California, 94066.  Upon information and belief, Outrider Master Fund, LP, may be served through its registered agent for service of process, Stephen Hope, 1001 Bayhill Dr. Ste 125, San Bruno, CA 94066, or otherwise in accordance with Rules 4(f) and 4(h)(2) of the Federal Rules of Civil Procedure.

8.     Defendant Elmar Finance, Inc. is a corporation organized and existing under the laws of the state of Texas, and has its principal place of business at 2 Artemissiou Street & Fleming Square, 166 75 Glyfada, Athens, Greece.  Upon information and belief, Elmar may be served through its registered agent for service of process, Elie Guggenheim, 150 Park Dr., San Antonio, Texas 78212 or otherwise in accordance with Rules 4(f) and 4(h)(2) of the Federal Rules of Civil Procedure.

9.     Defendant Ionic Capital Partners, LP, is a limited partnership organized and existing under the laws of the state of New York, and has its principal place of business in New York, New York.  Ionic may be served through its registered agent for service of process, The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

10.     Defendant CSTN, Ltd. is a limited liability company organized and existing under the laws of the state of Texas, and has its principal place of business in Houston,

Texas.  CSTN may be served through its registered agent for service of process, Greg Alger, 5555 San Felipe, Suite 200, Houston, Texas 77056.

### III.
#### JURISDICTION AND VENUE

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b). This adversary is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O).  This Court has "related to" jurisdiction over the claims asserted herein because the outcome of this proceeding will have an effect on the estate being administered in bankruptcy.  Frontera consents to the entry of final orders or judgment by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

12.     Venue is proper in this district pursuant to 28 U.S.C. 1409(a).

### IV.
#### OPERATIVE FACTS

13.     Frontera is an independent international oil and gas exploration and production company whose strategy is to identify and operate in emerging markets in Eastern Europe around the Black Sea, and is based in Houston, Texas.

**A.     Background Facts Relevant to Holdings' 10% Convertible Notes Due August 1, 2016**

14.     On June 28, 2011, Fontera announced an offer to holders of two series of existing notes due in 2012 and 2013, proposing to restructure those debt obligations pursuant to the terms of an accompanying Note Purchase Agreement (the "Agreement") and for other consideration set forth in that Agreement.  Specifically, the offer was made to the holders of 10% Convertible Notes due in 2012, and holders of 10% Convertible Notes due in 2013 (collectively, the "Old Notes").  Under the terms of the offer, holders of the Old Notes would receive at their option: (1)

ordinary shares of Frontera's common stock; (2) newly issued, 10% convertible notes with principal amounts of $1,000, maturing on August 1, 2016 (the "Notes"), which were to be unsecured and payable by Holdings; or (3) a combination of Frontera shares and the Notes.

15.   The terms of the Notes were described and agreed to in the Agreement that accompanied the exchange offer.  The Agreement stipulated that the Notes would constitute a senior, unsecured obligation of Holdings, which would be solely responsible for payment of principal and interest at an annual rate of 10%, unless either the Noteholders elected to convert them to Frontera shares or the Notes were redeemed or repurchased at an earlier date.

16.   Although not a payor under the Notes themselves, Frontera is a party to the Agreement, which includes various representations and warranties by Frontera and certain lending covenants that are enforceable against Frontera and that required Frontera to cause its subsidiaries, and to use its best reasonable efforts to cause an affiliate with operations in the Republic of Georgia (the "Operating Company"), to satisfy those covenants.  Such covenants include, for example, obligations for Frontera to assure the continuation of its and its subsidiaries' ordinary courses of business, payment of their executory obligations and debts incurred after the issuance of the Notes in the ordinary course of business, compliance with applicable workplace and environmental laws, maintaining corporate books and records, payment of taxes, and similar obligations. Nothing in the Notes or the Agreement establishes Frontera or any of its subsidiaries, other than Holdings itself, as a payor or guarantor of any duty to repay principal or interest owed under the Notes, however.

17.   Nevertheless, Holdings' schedule of assets submitted in connection with its Bankruptcy Petition lists a potential claim against Frontera for contributions in support of Debtor's repayment of debts owed to the Noteholders, potentially arising under to Sections 8.2 or

8.6 of the Agreement.  Frontera likewise believes and is informed that one or more of the holders of the Noteholders construes the aforementioned terms of the Agreement or other provisions of the Agreement to create some form of guarantee for the notes, either in the form of an absolute or conditional guarantee running from Frontera to the Noteholders.

18.     Section 8.2 of the Agreement provides, for example:

The Parent [Frontera] will pay and discharge, and will cause each of its Subsidiaries and will use its commercially reasonable bests efforts to cause the Operating Company to pay and discharge, at or before maturity, all of their respective material obligations and liabilities that are incurred after the date hereof, including, without limitation, tax liabilities, except where the same may be contested in good faith and by appropriate proceedings, and will cause each of its Subsidiaries to maintain, and will use their best efforts to cause the Operating Company to maintain, in accordance with GAAP, appropriate reserves for the accrual of any of same.

19.     Section 8.2 was not intended to and, by its unambiguous terms, does not create any form of guarantee of payment of the New Notes by Frontera or any subsidiary or affiliate of Frontera, other than Holdings itself.  Rather, this provision covenants that Frontera will pay **its own** debts incurred **after the date** of the Agreement, and it will cause its subsidiaries to, and will use its reasonable best efforts to cause the Operating Company to do the same.  This provision expressly does not create any obligation on the part of Frontera, its subsidiaries (other than Holdings itself) or the Operating Company to guarantee or otherwise secure any debt created under the Agreement or the Notes themselves, however.

20.     Similarly, Section 8.6 of the Agreement provides that: "The Parent [Frontera] will comply, and will cause each of their Subsidiaries, and will use their commercially reasonable efforts to cause the Operating Company to comply, with the terms of this Agreement and the Convertible Notes."   This provision likewise cannot be construed as creating guarantee obligations on the part of Frontera, because it acts only to assure the compliance with "the terms

of this Agreement and the Convertible Notes."   Although the Agreement includes various covenants and terms that are directly applicable to Frontera and, through it, to Frontera's subsidiaries and the Operating Company, none of those terms creates any form of surety or guarantee obligation.   To the contrary, the Notes specifically recite only a promise by Holdings to repay the notes, and discloses that the Notes "constitute[] a senior <u>unsecured</u> obligation of the Maker [i.e., Holdings], ranking equally with any existing and future senior unsecured Indebtedness of the Maker[.]"

21.     Accordingly, neither Frontera nor any of Frontera's subsidiaries (other than Holdings itself), or the Operating Company, has any liability to repay the Noteholders or the Chapter 7 estate of Holdings, either under the Agreement or the Notes.

**B.      Background Facts Relevant to Tortious Interference with Contract and Misappropriation of Trade Secrets**

22.     Approximately 70% of the Notes are now owned by Defendant Outrider Management, LLC.   Outrider is an investment management company that markets itself as focusing on the acquisition of debt and equities trading at a substantial discount to their intrinsic value or their ability to generate cash flow.   Consistent with this approach, between late 2011 and early 2012, Outrider acquired Notes with a face value of approximately $14.7 million.   Outrider has informed Frontera that it acquired those notes from their original holders at a steeply discounted price of only approximately $4 million.   Since then, Outrider and its founder Stephen Hope have aggressively sought to leverage that discounted acquisition of debt into a controlling position over Frontera and its valuable oil and gas rights throughout its operations, to the detriment of Frontera's shareholders and other creditors.

23.     Since acquiring the Notes, Hope engaged in regular contact with Frontera and its officers and directors, including Frontera's chief executive officer Steve C. Nicandros and its

then vice president for investor relations/business development Liz Williamson.  During mid-2013, Hope introduced to Frontera parties that Hope presented as potential investors or deal partners.

24.     On one such occasion, in October 2013, Mr. Hope sent Mr. Nicandros an emailed introduction of Bernhard Cociancig, the CEO of Czeck oil and gas exploration and production company known as MND, a.s.  Mr. Hope represented that the purpose of the introduction was to facilitate MND's exploration of a potential farm-in investment opportunity through which MND hoped to purchase an interest in Frontera's mineral rights related to the Taribani Field Complex of Block 12 in Kakheti, Georgia.  Mr. Hope further sought to insert himself and Outrider at the center of the negotiation process for that transaction, stating that, as a significant creditor of Frontera, he believed he could add value to the negotiation process.

25.     Despite having no direct apparent interest in these negotiations, Mr. Hope thereafter engaged in a series of communications with Frontera regarding MND's proposal, simultaneously attempting to direct the timing and content of Frontera's responses to MND and manufacturing an artificial atmosphere of urgency surrounding those negotiations.

26.     On or about November 1, 2013, Frontera met with several MND representatives in Vienna, Austria.  Following receipt of MND's bona fides, including information about the company, its sources of capital, and further information regarding the nature of its proposed farm-in, Frontera agreed to enter into a November 7, 2013 Confidentiality Agreement with MND permitting it to perform due diligence in connection with the proposal.   Under the terms of the Confidentiality Agreement, MND agreed that it would use Frontera's confidential information only in connection with its evaluation of the potential farm-in transaction described in the agreement, and that it would not disclose Frontera's confidential information to any person other

9

than its own or an affiliate's officers and directors, or its professional advisors, with a clear need

to access the information in connection with evaluating the proposed transaction.

27.    In reliance on MND's confidentiality agreements, during the months that

followed between November 2013 and February 2014 Frontera made extensive disclosures to

MND which included much of its most sensitive and protected confidential and trade secret

information.  This information included, without limitation, commercial, drilling, completion and

production logs for numerous wells; technical, geological and geophysical information related to

its mineral reserves derived at great expense through seismic and drilling core analyses; well

bore studies; field studies analyzing production results and characteristics of its wells;

authorizations for expenditures related to drilling, recompletion and other projects; reservoir

descriptions; historical production data; project economics and assumptions; schematics of

gathering capabilities; economic modeling data for future projects, and myriad other data

developed by Frontera.

28.    Throughout this period, Frontera continually pressed MND to provide it with a

specific proposal.  MND delayed providing any such specifics, but nevertheless made ever more

detailed and extensive demands for information.  Despite the fact that Outrider was neither a

signatory to the Confidentiality Agreement nor a direct participant in negotiations with MND, it

continually sought to insert itself into that process by pressing Frontera to provide the requested

information and seeking information and insights into Frontera's negotiation posture.

29.    Finally, in late February 2014, having received no specific proposals from MND,

Frontera proposed that MND enter into a farm-in agreement whereby MND provide

approximately $31 million in funding for a multi-well drilling project in exchange a share of

working interest in the Taribani Field.  MND's CEO Mr. Cociancig responded the following day

that MND would begin the board recommendation and approval process in connection with that transaction.

30.     Unbeknownst to Frontera, however, and contrary to the representations that both Outrider and MND used to induce Frontera to sign the Confidentiality Agreement and provide MND Access to its confidential and trade secret information, MND had no intention of entering into a farm-in agreement with Frontera.  On February 27, 2014, Frontera learned through an email that MND inadvertently sent to Frontera's financial advisors that MND's board of directors had approved a resolution to acquire Frontera itself with the support of VTB Bank, a Russia-based banking group.  In short, MND had lied about its intentions in order to induce Frontera to enter the confidentiality agreement, and then used Frontera's confidential information and trade secrets to evaluate and pursue a hostile takeover of the company.

31.     Moreover, it was immediately clear that MND had pursued this course of conduct with Outrider's full knowledge, consent and participation.  As discussed, Outrider brought MND to the table as a potential deal partner for Frontera, took an active and continual interest in the negotiation process, sought information from Frontera with respect to its intentions and negotiation positions, and repeatedly sought to manufacture an impression of urgency with respect to completing that process.  Outrider's founder Mr. Hope was likewise included in the otherwise internal MND email that revealed MND's board approval of a plan to pursue a hostile takeover of Frontera.

32.     Outrider actively participated in inducing Frontera to enter into its confidentiality agreement and share its confidential information and trade secrets on the basis of misrepresentations regarding MND's intentions, and pushed Frontera to provide ever greater amounts of information to MND pursuant to the terms of that agreement.  Outrider took these

11

steps despite knowing that Frontera was using that information for purposes that were wholly inconsistent with the farm-in agreement that Outrider and MND proposed as a basis for soliciting that agreement with Frontera, and that were in fact inimical to the best interests of Frontera and its shareholders.

33.     Unaware that its plans had been revealed to Frontera, during the weeks following this revelation MND, with Outrider's support, continued its misrepresentations regarding its intentions and its attempts to garner additional confidential and trade secret information from Frontera.   For its part, Frontera initiated an effort to obtain financing for a true farm-in investment from another entity and, in April 2014, Frontera announced a deal with Varange Exploration, Ltd., at which time MND and Outrider finally abandoned their efforts. Outrider and MND's actions nevertheless caused Frontera extensive actual damages, by interfering with a then-ongoing process to identify farm-in partners to help finance its development of its mineral interests in the Republic of Georgia and by causing the failure of advanced, confidential negotiations towards such an investment with a third party.

34.     Moreover, upon Frontera's information and belief, MND shared Frontera's confidential information and trade secrets with Outrider, in further breach of MND's Confidentiality Agreement with Frontera.   Frontera believes and is informed that outrider continues to hold Frontera's valuable, confidential information and trade secrets, and that it has used and is disclosing that information to continue its attempts to strip Frontera of its valuable mineral interests.

35.     During the period between mid-2015 and the present, in light of well-known adverse conditions in the oil and gas industry, Frontera repeatedly sought to engage Outrider in negotiations to repurchase its debt on terms that, while reflecting a discount to the face value of

the Notes, would have provided Outrider with substantial returns on its initial $4 million investment.  Outrider rejected every such overture, despite its knowledge that the Notes might not be capable of repayment in light of market conditions and the unsecured nature of the Notes. Outrider refused to consider repeated proposals by Frontera to repurchase or restructure the debt on terms that were exceptionally lucrative to Outrider.

36.     Then, in June 2016, Outrider introduced yet another entity to Frontera, Lothian Partners ("Lothian"), which Outrider represented was interested in investing in Frontera. Mirroring its prior conduct in concert with MND, Outrider demanded that Frontera provide Lothain access to its confidential information in order to evaluate a potential investment by Lothian in Frontera.  At that time, Frontera, through its financial advisors Rothschild, was already engaged in good faith efforts to reacquire or restructure its debt.  Notwithstanding Frontera's past experience with Outrider, however, it responded to Lothian's overture in good faith.

36.     During an introductory conversation between Lothian and Rothschild, Rothschild requested basic information regarding Lothian's identity, the sources of the funds it proposed to invest, the nature of its proposed investment, its past experience in similar investments, and related basic information that any oil and gas exploration company would reasonably request prior to considering disclosures of confidential information to a third party.  This information was especially crucial, in light of Frontera's past experience with Outrider and its fraudulent attempt to present MND as a "Trojan horse" investor to obtain Frontera's trade secrets and confidential information in aid of a hostile takeover bid.

37.     Despite numerous requests over a period of weeks, Lothian inexplicably refused to provide this basic information.  Instead, Outrider and Lothian jointly engaged in a campaign to

pressure Frontera through a series of increasingly hostile calls and emails that implied that Frontera had fiduciary or other legal duties to open its books and records to an unknown third party with undisclosed intentions towards it.   Finally, in mid-July 2016, following repeated refusals by Lothian to reveal the nature of its intended investments, the identity of its principals, the sources of its funds, and other such basic information, Frontera declined to disclose its confidential, proprietary and trade secret information to Lothian.

38.     Upon information and belief, Outrider has used and has shared Frontera's confidential and trade secret information improperly acquired through MND, in breach of MND's confidentiality agreement, to induce Lothian to join in an effort to strip Frontera of its mineral interests or otherwise to capture Frontera's most valuable assets, to the detriment of Frontera's shareholders and Holdings' other creditors.

## V.
### CAUSES OF ACTION

### A.     Count I—Application for Declaratory Relief (All Defendants)

39.     Frontera hereby adopts and incorporates by reference the allegations set forth in the preceding paragraphs 1-38 as if fully set forth herein.

40.     The unambiguous terms of Holdings' 10% Convertible Notes due 2016 and the Note Purchase Agreement that governs those Notes makes clear that they represent an unsecured obligation of Holdings alone, and that they are not guaranteed by or payable either by Frontera or any of Frontera's subsidiaries (other than Holdings) or by the Operating Company.

41.     Nevertheless, Frontera believes and is informed that certain Noteholders and the estate of its subsidiary Holdings take the position that Notes are guaranteed or otherwise payable by Frontera or its subsidiaries.   Accordingly, an actual controversy within the Court's jurisdiction exists with respect to the proper interpretation of the Notes and the related Note

14

Purchase Agreement.  Pursuant to 28 U.S.C. § 2201, Frontera therefore respectfully requests that the Court declare that:

    i)    Frontera Resources Holdings, LLC's 10% Convertible Notes due 2016 represent unsecured senior obligations of Frontera Resources Holdings, LLC alone;

    ii)    Frontera Resources Holdings, LLC's 10% Convertible Notes due 2016 are neither guaranteed nor otherwise payable by Frontera Resources Corporation; and

    iii)    Frontera Resources Corporation has no liability under the 10% Convertible Notes due 2016 to the Chapter 7 estate of Frontera Resources Holdings, LLC or to any of the Noteholder Defendants.

### B.    *Count II—Misappropriation of Trade Secrets (Outrider)*

42.    Frontera hereby adopts and incorporates by reference the allegations set forth in the preceding paragraphs 1-41 as if fully set forth herein.

43.    Outrider, acting in concert with MND, engaged in a scheme to misappropriate Frontera's trade secrets by misrepresenting MND's intentions to enter into a farm-in investment transaction with Frontera in order to induce Frontera to open its books and records to MND. Upon information and belief, Outrider acquired and still retains numerous Frontera trade secrets and confidential and proprietary information from MND, while acting with actual knowledge that MND was in breach of its contractual duties to hold those trade secrets in confidence from third parties, including Outrider.

44.    Outrider's conduct caused Frontera significant actual damages by disrupting Frontera's ongoing efforts to negotiate similar farm-in investments with third parties.  Upon

information and belief, Outrider is continuing to keep, use, and wrongfully disclose to third parties Frontera's trade secrets to the detriment of Frontera itself, its shareholders, and its and Holdings' other creditors by using those trade secrets to induce third parties including Lothian to engage in efforts to strip Frontera of opportunities that would otherwise flow to the benefit of Frontera's shareholders, and its own and its subsidiaries' creditors, including without limitation the remaining Noteholders.

45.     As a result of Outrider's past and continuing misappropriation of Frontera's trade secrets, Frontera has and will continue to suffer actual and consequential damages.  Additionally, Outrider has unjustly enriched itself through its misappropriation of Frontera's trade secrets. Frontera is therefore entitled to actual and consequential damages in an amount to be proven at trial, exemplary damages, disgorgement of any benefits obtained through Outrider's use of those trade secrets and confidential information, and injunctive relief on the terms described in section VII, below.

### C.     Count III—Tortious Interference with Contract (Outrider)

46.     Frontera hereby adopts and incorporates by reference the allegations set forth in the preceding paragraphs 1-45 as if fully set forth herein.

47.     On November 7, 2013, Frontera entered into a valid and enforceable confidentiality agreement with MND, a.s. as a condition for Frontera's agreement to provide MND access to its confidential, proprietary and trade secret information.  MND agreed that this information would be used solely for the purposes of evaluating a potential farm-in investment transaction between MND and Frontera related to Frontera's mineral interests in the Taribani Field Complex of Block 12 in Kakheti, Georgia.  MND further agreed that it would hold Frontera's information in confidence and that it would not disclose that information to third parties, including Outrider.

48.     Outrider willfully and intentionally interfered with Frontera's confidentiality

16

agreement with MND.  MND, acting at Outrider's encouragement and with Outrider's actual knowledge of the existence, terms and purpose of MND's confidentiality agreement with Frontera, breached that agreement by using Frontera's confidential information to advance a secret scheme to pursue a hostile takeover of Frontera.  Upon information and belief, MND also provided Outrider with copies of Frontera's confidential information, which Outrider continues to use to the detriment of Frontera in further violation of the terms of that confidentiality agreement.

49.     Outrider's intentional, tortious interference with Frontera's Confidentiality Agreement with MND has caused damages to Frontera and has unjustly enriched Outrider at Frontera's expense.

### D.      Count IV—Fraud (Outrider)

50.     Frontera hereby adopts and incorporates by reference the allegations set forth in the preceding paragraphs 1-49 as if fully set forth herein.

51.     Outrider introduced MND to Frontera and induced Frontera to enter into its Confidentiality Agreement with MND and to disclose vast amounts of Frontera's confidential and trade secret information on the basis of Outrider's representation that MND intended to propose a farm-out investment transaction related to a designated set of mineral interests identified in that Confidentiality Agreement.  Outrider's representations regarding the purpose of MND's due diligence were material to Frontera's decision to enter into the Confidentiality Agreement and to share its confidential, proprietary and trade secret information with MND.

52.     Outrider's representations were false.  Rather, Outrider's and MND's true purpose was to investigate and pursue a hostile acquisition of Frontera.  At the time it made those misrepresentations, Outrider knew they were false, or, in the alternative, it made those representations recklessly, as a positive assertion, and without knowledge of its truth.  Outrider intended that Frontera act in reliance on its misrepresentations, and Frontera did so rely.

53.     Outrider's misrepresentations regarding MND's intentions, its inducement of Frontera to enter into the Confidentiality Agreement, and its intentional and willful participation

in MND's misuse of Frontera's confidential information in breach of that Confidentiality Agreement, has and is continuing to cause Frontera to suffer actual damages, including through the interference with and loss of investment opportunities that might have facilitated the restructuring, repurchase or repayment of the Notes.  Upon information and belief, Outrider has further been unjustly enriched as a result of its fraud through the acquisition of Frontera's confidential information and valuable trade secrets, which Outrider has and is continuing to use to the detriment of Frontera, its shareholders, and the other Noteholders who are parties to this litigation.

**VI.**
**EXEMPLARY DAMAGES**
**OUTRIDER MANAGEMENT, LLC**

54.     Frontera hereby adopts and incorporates by reference the allegations set forth in the preceding paragraphs 1-53 as if fully set forth herein.

55.      Frontera hereby pleads its entitlement to recover exemplary damages from Outrider for the harm that resulted from Outrider's fraud, misappropriation of trade secrets, and its tortious interference with Frontera's confidentiality agreement with MND.

**VII.**
**INJUNCTIVE RELIEF**
**OUTRIDER MANAGEMENT, LLC**

56.     Frontera hereby adopts and incorporates by reference the allegations set forth in the preceding paragraphs 1-55 as if fully set forth herein.

57.     Pursuant to general principles of equity and Rule 65 of the Federal Rules of Civil Procedure, Frontera asks the Court to grant Frontera a temporary restraining order, a preliminary injunction, and, at the appropriate time, a permanent injunction enjoining Outrider and any and all persons acting in concert with them:

(1)     from directly or indirectly using or disclosing any trade secret, confidential or proprietary information of Frontera Resources Corp. or any subsidiary or affiliate of Frontera.  For the purposes of this injunction, "trade secret, confidential or

proprietary information," means information or material that is not in the public domain and that was disclosed or otherwise made available to MND, s.a., subject to the terms of the November 7, 2013 Confidentiality Agreement between Frontera Resources Corporation and MND, s.a.;

(2)     from directly or indirectly altering, destroying, modifying, tampering with, removing, deleting or destroying any data, documents, files, electronic data, information, or other records or property of Frontera that are now or were in Outrider's possession, including any information stored on any computer, mobile phone, tablet, or other electronic or digital storage device (cloud, USB, or otherwise);

(3)     to return to Frontera all: (a) tangible and electronically stored trade secret, confidential, and proprietary information and other property belonging to Frontera; (b) devices (including computers, electronic storage devices, phones, and tablets) that contain or at any point contained any tangible or electronically stored trade secret, confidential or proprietary information belonging to Frontera or any other information obtained from Frontera, including without limitation by and through MND, s.a., so that Frontera can forensically confirm that trade secret, confidential, and proprietary information does not exist on such device.   All passwords or other information necessary to access such devices and information shall be provided at the same time; and

(4)     to provide sworn, conclusive evidence from Outrider and all persons acting in concert with Outrider that all requirements of item (3) have been fulfilled.

## VIII.
### REQUEST FOR ATTORNEYS' FEES

58.     Frontera hereby adopts and incorporates by reference the allegations set forth in the preceding paragraphs 1-57 as if fully set forth herein.

59.     As set forth above, Outrider's actions of misappropriation were willful.  Pursuant to section 134A.005(d) of the Texas Civil Practice and Remedies Code (governing actions for

willful misappropriation of trade secrets), Frontera therefore requests costs and all reasonable and necessary attorneys' fees incurred by Frontera herein, including all fees necessary in the event of an appeal of this case to any federal district court, the United States Court of Appeals for the Fifth Circuit, or the United States Supreme Court, as the Court deems equitable and just.

## IX
### PRAYER

60.     Frontera hereby adopts and incorporates by reference the allegations set forth in the preceding paragraphs 1-59 as if fully set forth herein.

WHEREFORE, PREMISES CONSIDERED, Frontera Resources Corporation respectfully pray for a final judgment against Defendants that includes:

a)    Declarations that:

i)    Frontera Resources Holdings, LLC's 10% Convertible Notes due 2016 represent unsecured senior obligations of Frontera Resources Holdings, LLC alone;

ii)    Frontera Resources Holdings, LLC's 10% Convertible Notes due 2016 are neither guaranteed nor otherwise payable by Frontera Resources Corporation; and

iii)    Frontera Resources Corporation has no liability under the 10% Convertible Notes due 2016 to the Chapter 7 estate of Frontera Resources Holdings, LLC or to any of the Noteholder Defendants.

b)    Compensatory, actual, unjust enrichment, and consequential damages awarded from Outrider Management, LLC, which damages may be recognized as an offset to any liability that may be found against Frontera under the Notes;

c)    Prejudgment interest from Outrider Management, LLC;

d)    Post-judgment interest;

e)      Reasonable and necessary attorney's fees;

f)      Punitive and exemplary damages;

g)      Disgorgement of all benefits obtained directly or indirectly from Outrider Management, LLC's use of Frontera's confidential, proprietary or trade secret information;

g)      Permanent injunctive relief in the form set forth above; and

h)      Any and all other relief to which Frontera may show itself entitled.

Respectfully submitted:

**By:** ___/s/ Robin C. Gibbs___

    Robin C. Gibbs
    (Attorney-in-charge)
    State Bar No. 07853000
    Barrett H. Reasoner
    State Bar No. 16641980
    Angus J. Dodson
    State Bar No. 24034418
    **Gibbs & Bruns, LLP**
    1100 Louisiana, Suite 5300
    Houston, Texas 77002
    rgibbs@gibbsbruns.com
    breasoner@gibbsbruns.com
    jdodson@gibbsbruns.com
    Telephone: (713) 650-8805
    Fax: (713) 750-0903

    - and -

    William R. Greendyke
    State Bar No. 08390450
    Southern Dist. No. 576573
    R. Andrew Black
    State Bar No. 02375110
    Southern Dist. No. 37238
    **Norton Rose Fulbright US, LLP**
    1301 McKinney, Suite 5100
    Houston, Texas 77010-3095
    Telephone: (713) 651-5151
    Fax: (713) 651-5246
William.greendyke@nortonrosefulbright.com
Andrew.black@nortonrosefulbright.com

    **ATTORNEYS FOR PLAINTIFF**
    **FRONTERA RESOURCES CORP.**